# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| COREY LEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 14 C 0368 |
| v. | ) | |
| | ) | Judge Joan H. Lefkow |
| | ) | |
| TRACY ENGLESON, STEPHEN HAIRE, | ) | |
| DIANE SCHWARZ, MEGAN PINAS, | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

*Pro se* plaintiff Cory Lee brought this 42 U.S.C. § 1983 action claiming deliberate
indifference to his medical needs when he was incarcerated at Stateville's Northern Reception
and Classification Center ("Stateville NRC") in 2013-2014. Plaintiff challenges treatment that
he received for gastroesophageal reflux disease ("GERD"). Named as defendants are Diane
Schwarz, physician's assistant, Megan Pinas, licensed practical nurse, and Wexford Health
Sources, Inc. (hereafter collectively "the Medical Defendants") and Superintendent Tracy
Engleson and Officer Stephen Haire (hereafter collectively "IDOC Defendants"). Both the
Medical Defendants and the IDOC Defendants have filed motions for summary judgment (dkts.
136, 143), which are currently before the court. Plaintiff has failed to respond, though he was
repeatedly informed of the court's briefing schedule and granted three extensions of time (dkts.
147, 149, 152). For the reasons that follow, the court grants both the Medical Defendants' and
the IDOC Defendants' motions.

# I. Legal Standard

## A. Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56(a) requires the court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To establish that a material fact is undisputed, a party "must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Rule 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Rule 56(c)(3). Courts must "construe all facts and draw all reasonable inferences in favor of the nonmoving party." *Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Once the party moving for summary judgment demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the allegations of his complaint and "set forth specific facts showing that there is a genuine issue for trial." *Hannemann v. Southern Door County School Dist.*, 673 F.3d 746, 751 (7th Cir. 2012). A genuine issue of material fact exists only if there is evidence "to permit a jury to return a verdict for" the nonmoving party. *Egonmwan v. Cook County Sheriff's Dept.*, 602 F.3d 845, 849 (7th Cir. 2010); *Carroll*, 698 F.3d at 564 ("[m]ere metaphysical doubt" about material facts is not enough).

## B. Northern District of Illinois Local Rule 56.1

Consistent with the local rules, both the Medical Defendants and the IDOC Defendants filed Local Rule 56.1(a)(3) statements of undisputed facts along with their summary judgment motions. (Dkts. 144, 140-1.) Also consistent with the local rules, both sets of defendants filed and served on plaintiff a Local Rule 56.2 Notice, which explains in detail the requirements of Local Rule 56.1. (Dkts. 139, 146.)

Plaintiff failed to respond to defendants' summary judgment motions, despite the court's having granted him three separate extensions of time to do so and despite repeated warnings that failure to respond would result in the court's ruling on the motions based on the papers submitted by the defendants. (Dkts., 147, 149, 152.) Instead of responding to the summary judgment motions, plaintiff responded to the court's briefing schedules by filing repeated motions or letters that requested recruitment of counsel. (Dkts. 151, 152, 158, 162, 164.) The court had in fact recruited counsel on plaintiff's behalf at the outset of this case, upon screening of the original complaint under 28 U.S.C. 1915A. (Dkt. 4.) Recruited counsel drafted the third amended complaint – which is the operative complaint in this matter. (Dkt. 75.) But as the case further progressed, approximately seven months later, recruited counsel filed a motion to withdraw in which he attested that he could no longer in good faith continue to represent plaintiff consistently with his Rule 11 obligations to the court. (Dkt. 102.) This Court granted the motion to withdraw and directed that plaintiff shall proceed *pro se*. (Dkt. 104.)

In ruling upon plaintiff's first request for counsel after the summary judgment motions had been filed, this court explained that given the past history with recruited counsel and the particular issues raised in the summary judgment motions, this was not an appropriate case for the recruitment of a *second* attorney from the limited pool of attorneys who are eligible to

represent indigent plaintiffs. (Dkt. 153.) *See Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014) (While "[a]lmost everyone would benefit from having a lawyer . . . there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases."); *Grund v. Murphy*, 736 F. App'x 601, 604-05 (7th Cir. 2018) ("[a]llowing a litigant to proceed pro se when the court has made a reasonable effort to find a volunteer attorney is not an abuse of discretion as long as the litigant is adjudged competent") (citing *Pruitt v. Mote,* 503 F.3d 647, 654 (7th Cir. 2007); *Henderson v. Ghosh*, 755 F.3d 559, 564–65 (7th Cir. 2014)). The court recognized and considered plaintiff's stated limitations but found that plaintiff had not compellingly demonstrated the presence of any issues above and beyond the general obstacles posed by incarceration.

The court was further mindful that plaintiff's case is based on alleged medical deliberate indifference and that, "where an inmate alleges an objectively serious medical condition, it may be better to appoint counsel." *Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) (citing *Perez v. Fenoglio*, 792 F.3d 768, 784 (7th Cir. 2015)). But there is no absolute right to counsel each time a prisoner asserts a medical claim, even if other factors might limit his ability to litigate on his own or he is receiving assistance from other prisoners. *See Robinson v. Scrogum*, 876 F.3d 923, 925 (7th Cir. 2017). As the present opinion below demonstrates, this case turns on whether plaintiff can establish the defendants' sufficiently culpable state of mind, not on a technical analysis of the medical treatment that he received. The court lastly notes that it was not until plaintiff's fifth filing in response to the court's summary-judgment briefing schedule (at which point the summary judgment motion had been pending for four months and this case had been pending nearly five years) – that plaintiff first specified discovery that he purportedly needed the assistance of counsel to complete. (Dkt. 164.) But there was no suggestion in that

filing that plaintiff lacked the opportunity or ability to have pursued this discovery earlier, and thus shortly after plaintiff filed this request, the court accepted defendants' reply briefs and explained that it would take the summary judgment motions under advisement. (Dkt. 168.) As stated, plaintiff never did substantively respond to the motions for summary judgment.

A district court "is entitled to decide [a summary judgment] motion based on the factual record outlined in the Local Rule 56.1 statements." *Koszola v. Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004) (internal quotation marks and brackets omitted); *see also Stevo v. Frasor,* 662 F.3d 880, 886–87 (7th Cir. 2011); *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009); *Cichon v. Exelon Generation Co.,* 401 F.3d 803, 809 (7th Cir. 2005). Plaintiff's status as a *pro se* litigant does not excuse him from complying with Local Rule 56.1. *See Coleman v. Goodwill Indus. of Se. Wis., Inc.,* 423 Fed. Appx. 642, 643 (7th Cir. 2011) ("Though courts are solicitous of pro se litigants, they may nonetheless require strict compliance with local rules."); *Wilson v. Kautex, Inc.,* 371 Fed. Appx. 663, 664 (7th Cir. 2010) ("strictly enforcing Local Rule 56.1 was well within the district court's discretion, even though Wilson is a pro se litigant") (citations omitted).

Accordingly, the court will accept as true the facts set forth in Defendants' Local Rule 56.1(a)(3) statements, viewing those facts and the inferences therefrom in the light most favorable to plaintiff. *See* N.D. Ill. L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Parra v. Neal,* 614 F.3d 635, 636 (7th Cir. 2010); *Rao v. BP Prods. N. Am., Inc.,* 589 F.3d 389, 393 (7th Cir. 2009) ("In accordance with a local rule, the district court justifiably deemed the factual assertions in BP's Rule 56.1(a) Statement in support of its motion for summary judgment admitted because Rao did not respond to the statement.");

*see also Raymond v. Ameritech Corp.,* 442 F.3d 600, 608 (7th Cir. 2006); *Schrott v. Bristol–Myers Squibb Co.,* 403 F.3d 940, 943–44 (7th Cir. 2005); *Koszola,* 385 F.3d at 1108–09; *Smith v. Lamz,* 321 F.3d 680, 682–83 (7th Cir. 2003).

Nonetheless, "a nonmovant's failure to . . . comply with Local Rule 56.1 . . . does not . . . automatically result in judgment for the movant. The ultimate burden of persuasion remains with [the movant] to show that [he] is entitled to judgment as a matter of law." *Raymond,* 442 F.3d at 608 (internal citation omitted). In addition, notwithstanding any admissions, the court has interpreted plaintiff's filings in this case generously consistent with his *pro se* status and will construe those filings, as well as the record evidence (which includes his medical records and deposition in this case), in the light most favorable to him, to the extent that he could properly testify himself about the matters asserted. *See Sistrunk v. Khan*, 931 F. Supp. 2d 849, 854 (N.D. Ill. 2013); Fed. R. Evid. 602. With these standards in mind, the court turns to the relevant facts.

## II.    Factual Background

Lee, a former state-prisoner, was at all relevant times for purposes of this lawsuit incarcerated at Stateville NRC.  (Dkt. 140-1, IDOC SOF ⁋ 1.)   At all relevant times, the defendants held the following positions: Tracy Engleson was the superintendent of Stateville NRC (*Id.*, ⁋ 2); Stephen Haire was a correctional officer at Stateville NRC (*Id.*, ⁋ 4.); Wexford Health Sources, Inc. ("Wexford") is a private corporation that contracted with IDOC to provide certain medical services to inmates at various correctional facilities, including Stateville NRC (dkt. 144, Medical SOF ⁋ 50); Diane Schwarz was employed as a physician's assistant (PA) for Wexford, at Stateville NRC (*Id.*, ⁋ 10); and Megan Pinas was employed as a licensed practical nurse (LPN) for Wexford, at Stateville NRC (*Id.*, ⁋ 40).

Plaintiff testified that he has a long history of GERD, or acid reflux. (*Id.*, ¶ 59.) He started taking medication to treat GERD-related symptoms at age five (he was 35 at the time of his deposition in this case in May 2017). (*Id.*) Plaintiff explained that his GERD manifests in "episodes" or "flare-ups" where he vomits and cannot eat or drink, resulting in the need for intravenous hydration. (*Id.*, ¶ 62.) Prior to entering Stateville NRC in 2013, plaintiff experienced such episodes, but they became significantly more frequent after entering NRC. (*Id.*) In between episodes, his symptoms would calm down. (*Id.*, ¶ 72.) Just prior to plaintiff's 2017 deposition, at which time he was not incarcerated, he was diagnosed by a gastroenterologist with "cyclical vomiting." (*Id.*, ¶ 59.)

Plaintiff's medical records from Stateville NRC and PA Schwarz's testimony show the following. On February 11, 2013, plaintiff underwent an initial intake examination during which he reported a history of GERD. (*Id.*, ¶ 11.) The intake records note no known etiology for his condition. (*Id.*) He had been taking Protonix (medication used to treat certain stomach and esophagus problems including acid reflux) at that time. (*Id.*) The intake records do not reference any complaints by plaintiff of vomiting of blood, extreme weakness and pain, or an inability to eat or drink. (*Id.*)

On May 11, 2013, plaintiff chose to go to the yard instead of presenting for his medical sick call appointment. (*Id.*, ¶ 12.)

On July 12, 2013, plaintiff was seen by a physician and complained of vomiting after eating chicken the day before. (*Id.*, ¶ 13.) He was prescribed milk of magnesia and directed to follow up in the healthcare unit following his return from court. (*Id.*) Upon his return from court, he was seen again, and he reported a history of gastritis and GERD since childhood. (*Id.*) He was prescribed Tigan (a medication used to treat nausea and vomiting), Protonix, and Zantac.

(*Id.*)  Plaintiff was to return to be revaluated in 24 hours.  (*Id.*)  On July 13, 2013, plaintiff was seen by a nurse for a follow-up and provided with an injection of Tigan.  (*Id.*, ℙ 14.)  On July 14, 2013, plaintiff was again seen by a nurse for further follow-up and again provided with another injection of Tigan.  (*Id.*)

On July 16, 2013, PA Schwarz saw plaintiff for a follow-up visit on his prior complaints of nausea and vomiting.  (*Id.*, ℙ 15.)  She examined plaintiff; all results were normal. (*Id.*)  He was assessed as having dehydration and GERD.  (*Id.*)  She ordered a panel of blood work, increased his order for Protonix, and ordered IV hydration.  (*Id.*)  On July 17, 2013, Schwarz saw and examined plaintiff again.  (*Id.*, ℙ 16.)  He was provided with an IV saline solution for hydration.  (*Id.*)  On July 19, 2013, Schwarz saw and examined plaintiff for a follow-up on his hydration. (*Id.*, ℙ 17.)  He reported that he felt good.  (*Id.*)  The prior lab work noted that he was positive for Hepatitis C, which was a new finding.  (*Id.*)  His examination was unremarkable. (*Id.*)  Schwarz instituted a plan for immunizations for Hepatitis A and B.  (*Id.*)  On July 26, 2013, she saw and examined plaintiff for another follow-up visit.  (*Id.*, ℙ 18.)  He looked well, and he stated that he felt well.  (*Id.*)   The examination was unremarkable.  (*Id.*) Schwarz provided him with an order for a snack bag and for the Hepatitis C clinic and lab testing.  (*Id.*)  On August 19, 2013, plaintiff received a 30-day renewal of his Protonix medication.  (*Id.*, ℙ 19.)

On September 21, 2013, plaintiff was seen by a physician and nurse after reporting that he injured his finger while lifting weights.  (*Id.*, ℙ 20.)  The records reflect plaintiff's statement that "they didn't treat me this good [at] county.  The nurses here treat me good."  (*Id.*)  He was prescribed Tylenol and Motrin and his finger was wrapped in dressing.  (*Id.*)

On October 19, 2013, plaintiff complained to a certified medical technician (CMT) of a history of vomiting and stated that he had chronic gastritis or GERD.  (*Id.*, ℙ 21.)  He also stated,

"I need to have IV to rehydrate me and then I'll be better." (*Id.*) On October 23, 2013, PA Schwarz examined plaintiff. (*Id.*, ¶ 22.) Plaintiff stated that once he gets an IV for hydration following his episodes of nausea and vomiting, he is fine. (*Id.*) She noted that since February of 2013, he has had multiple lab tests, which have returned no significant findings. (*Id.*) Schwarz noted that plaintiff's condition was normal at that time. (*Id.*) He received IV fluids per her order, and she also ordered additional lab testing, and a special permit for ice and a water pitcher. (*Id.*) On October 30, 2013, Schwarz performed a follow-up examination. (*Id.*, ¶ 23.) She noted that he felt well, his chemistry was normal, labs were normal, and his examination was normal. (*Id.*) She ordered an ultrasound and repeat labs on November 11, 2013. (*Id.*)

On November 12, 2013, plaintiff was seen by a nurse after complaints of nausea and vomiting. (*Id.*, ¶ 24.) He was also examined by a physician and was prescribed Tigan and an IV for hydration. (*Id.*) The record suggests that plaintiff indicated that he would refuse certain medications. (*Id.*) On November 18, 2013, plaintiff was seen by a physician for his Hepatitis C. (*Id.*, ¶ 25.)

On December 24, 2013, PA Schwarz saw plaintiff following his complaints of nausea, vomiting, and dehydration. (*Id.*, ¶ 26.) The etiology of these symptoms was unknown, but he was known as being Hepatitis C positive. (*Id.*) The records reflect that at this point plaintiff was known to have a history of monthly occasional nausea and vomiting. (*Id.*) PA Schwarz issued an order for his lab testing for the Hepatitis C clinic, saline solution for hydration, Tigan, as an anti-nausea and vomiting medication, and for a follow-up the next month. (*Id.*) She also noted that his ultrasound was pending. (*Id.*)

On January 8, 2014, PA Schwarz saw plaintiff following his report of another episode of nausea and vomiting. (*Id.*, ¶ 27.) She ordered IV fluids and a referral to the UIC Hepatitis C

clinic. (*Id.*)   On January 27, 2014, Schwarz again examined plaintiff.  (*Id.*, ¶ 28.)  He had presented to the healthcare unit with complaints of nausea, vomiting, and dehydration.  (*Id.*)   He received fluids in the healthcare unit. (*Id.*)

On February 5, 2014, PA Schwarz saw and examined plaintiff to discuss his prior lab work.  (*Id.*, ¶ 29.)  She noted that he arrived at the healthcare unit complaining of episodes of nausea and vomiting once or twice per month, but that his lab tests have all returned within normal limits.  (*Id.*)   PA. Schwarz also noted that his ultrasound had been performed and was normal and that his examination was normal.  (*Id.*)   She provided him with a Boost supplement, and referred him to a hepatologist physician for management of his Hepatitis C.  (*Id.*)   She also changed his order for Protonix to Zantac. (*Id.*)   On February 26, 2014, Schwarz wrote plaintiff a permit for a water pitcher, ice chips, and an evening snack.  (*Id.*, ¶ 30.)  On February 28, 2014, Schwarz again examined plaintiff. (*Id.*, ¶ 31.)  He complained that he had been vomiting; however, he was observed only spitting into a vomit bag.  (*Id.*)   His labs were all normal. (*Id.*)   Schwarz ordered a medication for anti-nausea and a saline IV for hydration.  (*Id.*)

On March 25, 2014, Schwarz examined plaintiff. (*Id.*, ¶ 32.)  She noted his history of nausea, vomiting, and dehydration, and that she had previously issued a permit for him to have special food shopping privileges at the commissary. (*Id.*)   Schwarz noted that the plaintiff's only positive finding was a slightly elevated liver test, related to his Hepatitis C.  (*Id.*)   He was provided with fluids for hydration. (*Id.*)   On April 11, 2014, PA Schwarz saw and examined plaintiff for a follow-up on his prior complaints of nausea and vomiting. (*Id.*, ¶ 33.)  She noted that her objective assessment of him was unremarkable and he was stable. (*Id.*)   She ordered Zantac and Tigan medications.  (*Id.*)

On April 17, 2014, PA Schwarz examined plaintiff when he was brought to the healthcare unit for complaints of nausea and vomiting. (*Id.*, ⁋ 34.) She ordered fluids for hydration and an anti-nausea medication. (*Id.*) On April 24, 2014, PA Schwarz examined plaintiff for a follow-up visit after his off-site appointment with a gastroenterology specialist. (*Id.*, ⁋ 35.) She noted that he had a working diagnosis of GERD. (*Id.*)

On May 19, 2014, Schwarz examined plaintiff in the healthcare unit following his complaints of abdominal pain and having run out of Zantac medication. (*Id.*, ⁋ 36.) She issued an order for Tigan, Ativan (for anxiety), and Zantac. (*Id.*) On May 28, 2014, Schwarz wrote a note stating that plaintiff had been purchasing jalapeno tuna, nacho chips, BBQ chips, and jalapeno cheese at the prison commissary. (*Id.*, ⁋ 37.) Such foods were not part of the recommended diet for plaintiff, given his history. (*Id.*)

On June 5, 2014, Schwarz wrote a note indicating that plaintiff was to be discharged or transferred the next day. (*Id.*, ⁋ 38.) She noted that she had seen the plaintiff during his time at the NRC, every three to four weeks, related to his complaints of nausea, vomiting, dehydration, and pain. (*Id.*) Schwarz indicated that plaintiff had undergone multiple examinations and tests which were all normal, other than his Hepatitis C finding. (*Id.*)

Plaintiff testified that he indeed saw Schwarz frequently at Stateville NRC and that he believed she was "the only one" trying to help with his complaints and that she was "doing the best that she could." (*Id.*, ⁋ 70.) Nonetheless, plaintiff explained that he filed this lawsuit because he believes he had to wait too long to receive medical care once an episode started, that medical staff would see him only when finally "forced" to do so by unidentified superiors, and that the frequent episodes of vomiting and dehydration persisted. (*Id.*, ⁋ 65.)

As to Nurse Pinas, in her capacity as an LPN. for Wexford, her duties primarily included distributing and administering medications to inmates in their cells during what was known as "Med pass," the process by which inmates received medications in their cells on a per-dose basis. (*Id.*, ¶ 41.) Each day, she would distribute hundreds of medications to inmates within Stateville NRC. (*Id.*) While passing medications to inmates, it was not Nurse Pinas' assigned duty or responsibility to perform evaluations or examinations upon inmates within the cell house, render treatment to inmates, or receive written requests for care (sick call slips) from inmates. (*Id.*, ¶ 42.) Due to the number of inmates and the need for medications to be distributed to inmates on a timely basis, she was neither assigned, nor able, to perform any other nursing functions during her assigned med pass schedule. (*Id.*)

Plaintiff testified that he would complain to Nurse Pinas that he was sick and ask her to get him help as she passed his cell during Med Pass, but Nurse Pinas would ignore him. (*Id.*, ¶ 73.) On some occasions when this happened, although he cannot remember specific dates, plaintiff says that he was balled up in the fetal position while his cellmate asked Nurse Pinas for help on his behalf as she passed by. (*Id.*)

Nurse Pinas attested that making verbal complaints to Med pass staff while they were distributing medications in the cell house is not the appropriate or designated method for an inmate to request to be seen by healthcare staff in a non-emergency situation. (*Id.*, ¶ 46.) Nurse Pinas also attested that plaintiff never presented to her in an emergency state, as it would have been her practice and habit, if she observed or became aware of an inmate in an emergency medical state, to immediately contact the appropriate providers or staff to have the inmate examined. (*Id.*, ¶ 47.)

If an inmate at Stateville NRC was seeking medical attention for a non-emergency condition, the process in place was for the inmate to submit a written sick-call request slip. (*Id.*, ℙ 43.) This sick-call slip requirement is an IDOC protocol and requires an inmate to deposit a sick-call request slip into a box located in the cell house or to sign his name to a sheet located in the cell house. (*Id.*) Plaintiff testified that he was aware of the sick call system at NRC. (*Id.*, ℙ 66.) Per IDOC protocol, it was not Nurse Pinas' duty or responsibility to personally review sick-call requests for medical attention. (*Id.*, ℙ 44.) Instead, IDOC-employed nursing staff would typically screen and triage these requests and then make determinations, consistent with nursing protocols developed by the IDOC, as to what action should be taken regarding the particular inmate's request for medical attention. (*Id.*) Nurse Pinas was also not involved in scheduling inmates for their appointments, as IDOC-employed nursing staff also typically did so. (*Id.*)

It was thus not Nurse Pinas' duty to receive any sick-call requests from plaintiff, schedule him to see providers, or provide him with treatment. (*Id.*, ℙ 45.) Plaintiff never personally provided Nurse Pinas with a written sick-call request to be seen, nor was she ever involved in evaluating plaintiff or making decisions about his treatment. (*Id.*, ℙ 48.)

As to Superintendent Engleson, plaintiff named her as a defendant in this lawsuit because she is the overseer of Stateville NRC. (Dkt. 140-1, IDOC SOF ℙ 10.) Plaintiff testified that Engleson was aware of his medical condition because his mother had sent a grievance on plaintiff's behalf to Engleson through registered mail. (*Id.*, ℙ 11.) Plaintiff, however, does not know whether Engleson signed for the certified mail and received his grievance. (*Id.*, ℙ 12.) Engleson denies that she was ever informed about plaintiff's GERD episodes. (*Id.*, ℙ 13.)

Plaintiff can only recall two occasions in which he spoke directly to or encountered Engleson, although he cannot recall the dates of these encounters. (*Id.*, ¶¶ 14-15.) One conversation involved Engleson's assisting plaintiff in obtaining a PIN number so he could use the telephone. (*Id.*, ¶ 16.) During the second encounter, Engleson saw plaintiff vomiting in a bullpen and had him sent to the healthcare unit. (*Id.*, ¶ 17.)

As to Officer Haire, plaintiff has no independent recollection of him but testified that he would have named him as a defendant in this lawsuit because he "ignored" plaintiff. (*Id.*, ¶¶ 20-21.) He testified that Haire should be held liable because, as a correctional officer, if he saw an inmate in plaintiff's "condition" in his cell, he should have notified a supervisor. (*Id.*) But plaintiff cannot independently remember specifics of any occasion where Officer Haire saw plaintiff sick in his cell and failed to respond or any other situation where Haire ignored his medical condition. (*Id.*) Haire denies that he was ever informed about plaintiff's medical conditions. (*Id.*, ¶ 23.)

Lastly, the IDOC has a formal grievance procedure for inmates which, generally speaking, has three steps: (1) attempting to resolve grievances through a counselor; (2) filing a written grievance on a grievance form; and (3) appealing the denial of a grievance to the Administrative Review Board ("ARB"). (*Id.*, ¶¶ 24-25.) In an emergency situation, an inmate may request that a grievance be reviewed on an expedited basis by following certain procedures. (*Id.*, ¶ 27.) Anna McBee, a Correctional Counselor II and Grievance Officer at Stateville Correctional Center searched the Stateville Grievance Office's records for any grievances filed by plaintiff. (Inmate grievances from Stateville NRC are processed through the Grievance Office at Stateville). (*Id.*, ¶ 35.) This search revealed no grievances or related documents related to medical treatment filed by plaintiff. (*Id.*) Leslie McCarty, chairperson of the ARB, searched the

ARB records for grievances filed by plaintiff.  (*Id.*, ℙ 34.)  This search revealed that plaintiff did not file any grievances related to medical treatment with the ARB.  (*Id.*)  Plaintiff, however, testified that he filed multiple grievances by filling out grievance forms and giving those forms to his counselor, but he did not receive responses.  (Dkt. 144-7 at 73-74.)

## III.    Analysis

Plaintiff's Third Amended Complaint, which was drafted by previously recruited counsel, raises claims of deliberate indifference to his GERD episodes.  (Dkt. 75.)  He claims that defendants ignored his requests for healthcare and/or persisted in ineffective treatment.

Both the Medical Defendants and the IDOC Defendants have moved for summary judgment.  (Dkts. 143, 136.)  Both contend that (1) plaintiff failed to exhaust his administrative remedies; (2) plaintiff's medical conditions was not objectively serious; and (3) no defendant was subjectively deliberately indifferent to plaintiff's medical needs.  (Dkts. 137, 145.)  For the reasons explained below, the court finds that all defendants are entitled to judgment as a matter of law and grants both motions for summary judgment.

## A.    Exhaustion of Administrative Remedies

Both the Medical Defendants and IDOC Defendants argue that plaintiff failed to exhaust his administrative remedies prior to filing suit as required by 42 U.S.C. §1997e(a). (Dkt. 145 at 3-5; Dkt. 137 at 5-8.)

The Prisoner Litigation Reform Act ("PLRA") requires the exhaustion of "administrative remedies as are available."  42 U.S.C. § 1997e(a).  An inmate must use "'all steps that the agency holds out," and he must "do[] so properly (so that the agency addresses the issues on the merits).'" *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (*quoting Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)).  "The benefits of exhaustion can be realized only if the prison

grievance system is given a fair opportunity to consider the grievance." *Pavey v. Conley*, 663 F.3d 899, 905–06 (7th Cir. 2011). An inmate, however, must exhaust only such administrative remedies as are "available" to him. 42 U.S.C. § 1997e(a). Prison authorities may not affirmatively mislead an inmate regarding available procedures. *See Twitty v. McCoskey*, 226 F. App'x 594, 596 (7th Cir. 2007). Defendants bear the burden of demonstrating non-exhaustion. *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013).

Defendants point to the fact that searches by qualified personnel of both Stateville and ARB records located no grievances filed by plaintiff regarding his healthcare. Plaintiff, however, testified that he submitted multiple grievances on the appropriate forms to his counselor but did not receive any responses. Drawing all inferences in plaintiff's favor, his testimony creates a genuine issue of material fact as to whether the grievance process was "available" to him and thus whether he met his burden. Accordingly, defendants' motions are denied to the extent they are based on a failure to exhaust available administrative remedies.[1]

## B. Eighth Amendment Claim for Deliberate Indifference to Medical Needs

The Eighth Amendment's proscription against cruel and unusual punishment "safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir, 2011) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Accordingly, 'deliberate

---

[1] Procedurally speaking, the Seventh Circuit has instructed that as a matter of best practices, the issue of exhaustion should be resolved at the start of the case, before pretrial discovery begins. *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008). This decision led to what this circuit now refers to as a *Pavey* hearing, where the district court—sometimes after allowing limited discovery solely on the issue of exhaustion—conducts an evidentiary hearing to decide whether a plaintiff has satisfied the exhaustion requirement. *Id*. Early resolution of the exhaustion issue both comports with the PLRA and promotes judicial economy by potentially allowing the parties to avoid the cost of discovery altogether. *Id*. Given that defendants here did not raise the exhaustion issue until years after this case was filed and once discovery on the merits had already concluded, the court declines to conduct a *Pavey* hearing in this instance and shall instead address the merits of plaintiff's claims.

indifference to serious medical needs' of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Roe*, 631 F.3d at 857 (quoting *Estelle*, 429 U.S. at 104). A deliberate indifference claim consists of both an objective and a subjective element. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). An inmate must be able to establish both: (1) he suffered an objectively serious medical condition, and (2) defendants acted with deliberate indifference to that condition. *Id.* The court addresses these components in turn.

### 1.  Objectively Serious Medical Need

The Medical Defendants argue that plaintiff did not demonstrate an objectively serious medical condition. (Dkt. 145 at 6.) A medical need is objectively serious when "the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (quoting *Roe*, 631 F.3d at 857). Indications of a serious medical need include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997); *see also Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (a condition is objectively serious if "failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain"). The Seventh Circuit has recognized that GERD can constitute a serious medical need. *Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) (painful GERD was considered an objectively serious condition).

The court finds, based on the ongoing symptoms that plaintiff reported, namely episodes of vomiting and attendant dehydration, and the substantial amount of care rendered, a genuine

issue of material fact that plaintiff's condition is objectively serious for purposes of an Eighth Amendment claim. Summary judgment on the objective prong is therefore not appropriate.

### 2. Subjective Deliberate Indifference

Summary judgment should, however, be granted because plaintiff has not shown any Defendant's subjective deliberate indifference. Plaintiff must demonstrate that the defendant in question was aware of, and consciously disregarded, his medical need. *Farmer*, 511 U.S. at 837; *Estelle*, 429 U.S. at 103-04; *Rowe v. Gibson*, 798, F.3d 622, 627 (7th Cir. 2015). The court addresses the Medical Defendants and the IDOC Defendants in turn below because "[c]laims of deliberate indifference to medical needs are examined differently depending on whether the defendants in question are medical professionals or lay persons." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013).

### a. Medical Defendants

It is undisputed that plaintiff received medical attention, albeit not to his satisfaction. Inmates are not entitled to "unqualified access to healthcare," *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012), or the best care possible, *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). Neither medical malpractice, nor negligence, nor even gross negligence rise to the requisite culpable state of mind for deliberate indifference, which is akin to criminal recklessness. *See, e.g., Cesal v. Moats*, 851 F.3d 714, 725 (7th Cir. 2017); *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012).

Thus, a prison medical provider is not deliberately indifferent simply because he offers a different course of treatment than the one requested by the inmate. *Berry v. Peterman,* 604 F.3d 435, 441 (7th Cir. 2010). Nevertheless, "[t]he receipt of some medical care does not automatically defeat a claim of deliberate indifference," which still lies if a "prison official,

having knowledge of a significant risk to inmate health or safety, administers blatantly inappropriate medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (internal quotations and citations omitted).

### i. PA Schwarz

The crux of plaintiff's complaint with respect to PA Schwarz is that his symptoms persisted despite the care that he admittedly received from her. He thus appears to argue that Schwarz was constitutionally required to arrange for or offer additional care in light of his persistent symptoms. Plaintiff also suggests that the medical staff (presumably including Schwarz) saw him only when "forced" to by unidentified superiors. The court construes this as an argument that there were unconstitutional delays in the administration of care.

Even when construed liberally, however, these arguments do not create a triable issue of act as to deliberate indifference on the part of PA Schwarz. As the Medical Defendants contend, the extensive totality of the care that

Plaintiff received from PA Schwarz negates subjective deliberate indifference on her part. (Dkt. 145 at 6-8.) The undisputed evidence shows that during plaintiff's approximately 1.5-year incarceration at Stateville NRC, PA Schwarz personally saw plaintiff on average multiple times each month (and sometimes multiple times weekly for follow-ups). She closely monitored his condition by ordering frequent diagnostic tests, such as blood panels and an ultrasound – all of which returned normal findings – and referred him to a gastroenterology specialist. She also provided him with continuous treatment including prescriptions for anti-nausea medication; prescriptions for various reflux and heartburn medications; several courses of IV hydration; and

numerous special dietary permits.  Moreover, she routinely re-evaluated, revised, and adjusted all of the above based on how plaintiff presented at his appointments plaintiff even testified that PA Schwarz was "the only one who cared" and that she was "doing her best."

To succeed on his claim, plaintiff must show that this course of treatment was "blatantly inappropriate," which the Seventh Circuit has also described as amounting in this context to "a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Duckworth v. Ahmad*, 532 F.3d 675, 682 (7th Cir. 2008).   But no evidence here suggests that PA Schwarz's treatment plan for plaintiff's GERD episodes consisting of reflux medications, anti-nausea medication, IV hydration, and special diet was based on anything other than her evolving medical assessment of plaintiff's condition, especially as the continued diagnostics (including ultrasound and referral to a specialist) that she had ordered produced unremarkable findings. Mere disagreement by a prisoner with his treatment plan does not establish that a treater has "persisted with an ineffective course" for Eighth Amendment purposes.  *Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017); *see, e.g., Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 663-64 (7th Cir. 2016) (affirming summary judgment in favor of prison doctor when the prisoner failed to identify evidence showing that the challenged treatment decision was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment"); *Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (rejecting prisoner's argument that prison doctor's choice of pain medication demonstrated deliberate indifference because the prisoner's own doctor recommended a different medication when no evidence suggested that the prison doctor's decision was a substantial departure from accepted professional standards or was not based on a medical judgment); *contrast Greeno v.*

*Daley,* 414 F.3d 645, 655 (7th Cir. 2005) (summary judgment denied where prison doctor 'doggedly persisted" in treating plaintiff's heartburn and vomiting with only antacids for three years, when plaintiff complained that they worsened his condition, and conducted no diagnostic testing to determine the underlying cause of plaintiff's condition).

To the extent that plaintiff contends that PA Schwarz knowingly delayed in seeing and treating plaintiff following the onset of an episode, he fares no better. First, any suggestion that she was aware of plaintiff's episodes but refused to see plaintiff without persuasion from superiors is based on plaintiff's sheer speculation. Plaintiff's speculation is insufficient to defeat summary judgment. *Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005) (explaining that "mere speculation or conjecture will not defeat" a motion for summary judgment). In any event, the court must examine the entire record of medical treatment, and occasional isolated incidents of delay or negligence are insufficient to support an inference of deliberate indifference. *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 591 (7th Cir. 1999). Here, again, the record shows without dispute that for almost one-and-a-half years, PA Schwarz regularly monitored, assessed, treated, and revised treatment for plaintiff. In the context of that long-standing attentiveness, occasional short periods of delay – even had plaintiff identified them with specificity – are not deliberate indifference. *Redman v. Doehling*, No. 18-1036, 2018 WL 4632072, at *3 (7th Cir. Sept. 26, 2018).

Nor does plaintiff point to any evidence indicating that any delay(s) in obtaining medical attention caused him additional harm. "'A delay in the provision of medical treatment for painful conditions . . . can support a deliberate indifference claim.'" *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009) (quoting *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008). But to prevail on such a claim, the plaintiff must "introduce[] verifying medical evidence

that shows his condition worsened because of the delay." *Knight*, 590 F.3d at 466; *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007) (a plaintiff must "offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm"). Plaintiff submits no such evidence. Indeed, plaintiff testified that he suffered from GERD-related symptoms and flair-ups for decades prior to his incarceration at Stateville NRC and continued to suffer from those symptoms in the years following the incarceration through to the present.

Plaintiff believes that Schwarz should be held liable because she did not stop, *i.e.,* cure, his GERD flair-ups, despite admittedly her best efforts. But, again, plaintiff was not entitled to dictate the terms of otherwise reasonable care. *See Harper v. Santos*, 847 F.3d 923, 927 (7th Cir. 2017); *Arnett*, 658 F.3d at 754; *White v. Poore*, 737 F. App'x 793, 795 (7th Cir. 2018). The Constitution guarantees plaintiff treatment within the applicable Eighth Amendment standard, not a specific outcome. *See Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997) ("Forbes is seeking a specific treatment and foolproof protection from infection. The Eight[h] Amendment does not provide her with either."); *see also Lewis v. Uy*, No. 2:08-CV-0037, 2010 WL 1236337, at *2 (N.D. Tex. Feb. 12, 2010), report and recommendation adopted, No. 2:08-CV-0037, 2010 WL 1254268 (N.D. Tex. Mar. 31, 2010) (prisoner's desire for alternative care for his shoulder condition because he continued to experience pain did not have constitutional dimension because he did not identify "any legitimate medical protocol which would make him pain free and which was refused" and "not every patient can be healed, *i.e.*, returned to a previous state of near-perfect health and not every patient can be rendered pain-free without addictive drugs").

In sum, nothing in the record here establishes either a substantial departure by PA Schwarz from acceptable medical judgment or refusal to treat plaintiff. On the contrary, the

record establishes ongoing and comprehensive care for plaintiff's GERD. Plaintiff having "fail[ed] to make a showing sufficient to establish the existence of an element essential to [his] case [subjective deliberate indifference], and on which [he] will bear the burden of proof at trial," Schwarz is entitled to summary judgment. *Celotex*, 477 U.S. at 322; *see also Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014).

### ii. Nurse Pinas

It is undisputed that Nurse Pinas was not personally involved in plaintiff's medical care. According to plaintiff's own testimony, the sole basis for his claim against Nurse Pinas is that she would ignore his verbal requests "for help" on account of being "sick" as she passed his cell during Med pass. The Medical Defendants respond – and no evidence of record disputes – that making verbal complaints to nurses during Med pass is not an appropriate or designated method by which an inmate may request to be seen by healthcare staff in a non-emergency situation. (Dkt. 145 at 8-9.) In such situations, per IDOC policy, an inmate must submit a written sick-call request. Nurse Pinas has testified – also without dispute in the record – that plaintiff never presented to her in an emergency condition (plaintiff testified only that he was sometimes in the fetal position when she passed by), nor did he ever attempt to hand her a sick-call request slip. Moreover, as the Med pass nurse, it is undisputed that it was not within her job responsibilities in any event to receive written sick-call requests or to evaluate or treat inmates as she passed out medication, which, she explained, would have made her job untenable.

Ultimately, a prison official cannot be held liable for failing to take action outside of her job duties. *Burks v. Raemisch,* 555 F.3d 592, 595 (7th Cir. 2009). Rather, the Seventh Circuit has explicitly explained that prison administrators may divide responsibilities amongst personnel:

> Public officials do not have a free-floating obligation to put things to rights, disregarding rules (such as time limits) along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen.

*Id.*; *see. e.g., Grothjan v. Taylor*, No. 3:17-CV-83-PPS-MGG, 2019 WL 428521, at *6 (N.D. Ind. Feb. 1, 2019) (defendant who was a mental health professional was not deliberately indifferent by refusing to meet with plaintiff because defendant held a purely administrative role at prison and was entitled to rely upon mental health staff to conduct plaintiff's treatment); *Dahlk v. Woomer*, No. 12-CV-0556, 2014 WL 1329461, at *8 (E.D. Wis. Mar. 31, 2014), *aff'd*, 592 F. App'x 523 (7th Cir. 2015) (defendant was not deliberately indifferent where he did not arrange for medical attention for plaintiff who was not in an emergency state, but instead directed plaintiff to contact prison personnel responsible for arranging for such medical attention); *Lucio v. Oelberg*, No. 15-CV-4103-SLD, 2018 WL 810493, at *8 (C.D. Ill. Feb. 8, 2018) ("Liability does not extend to everyone who knows about an inmate's conditions, and at some point, correctional officers must be permitted to rely on the division of labor within the prison."). Nurse Pinas was entitled to depend on the appropriate health care staff to assess plaintiff's needs and to provide appropriate care and treatment. The Eighth Amendment did not require her to personally arrange for such care or to otherwise follow up on whether plaintiff received medical appointments. Summary judgment is granted in favor of Nurse Pinas.

### iii. Wexford Health Sources, Inc.

Even if plaintiff had established deliberate indifference on the part of an individual medical defendant (which he has not), "[t]o hold [an entity] liable under § 1983 and *Monell*, [a plaintiff] must demonstrate that the [defendant's] 'official policy, widespread custom, or action

by an official with policy-making authority was the "moving force" behind his constitutional injury.'" *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) (quoting *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016)). Not only overt policies, but also "implicit policies as well as a gap in expressed policies," may be sufficient. *Id.* at 734.

Plaintiff may prove an unlawful custom or widespread policy by demonstrating that the challenged practice "'was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision.'" *Dixon*, 819 F.3d at 348 (quoting *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006). He "can meet this burden by offering 'competent evidence tending to show a general pattern of repeated behavior (i.e., something greater than a mere isolated event).'" *Daniel*, 833 F.3d at 734 (quoting *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006)). Thus, he is required to "show more than the deficiencies specific to his own experience" but instead bring forth "evidence that could allow a reasonable trier of fact to find . . . 'systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical system,'" of which the policy maker or official was aware but failed to correct. *Id.* at 734-35 (citations omitted). He then must "show that a policymaker or official knew about these deficiencies and failed to correct them." *Id.* at 735.

Plaintiff has not pointed to sufficient (or any) evidence on this issue; indeed his third amended complaint does not even allege the existence of any unconstitutional policy. The record does not support a finding that any alleged deficiencies in plaintiff's care were attributable to any widespread practice beyond alleged "deficiencies specific to his own experience." *See Daniel*, 833 F.3d at 734-35. Absent a demonstrable corporate policy or practice responsible for constitutional deficiencies in plaintiff's care, Wexford is entitled to judgment a matter of law.

### b.     IDOC Defendants

#### i.     Superintendent Engleson

Because Engleson is a supervisor and is sued as such, to be liable under § 1983, she must have "know[n] about the [unconstitutional] conduct and facilitate[d] it, approve[d] it, or turn[ed] a blind eye." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Engleson denies receiving the grievance that plaintiff testified his mother sent to her via certified mail. Construed liberally, with all inferences drawn in plaintiff's favor, the record and his testimony on this issue creates a question of fact as to whether the grievance was in fact received. But regardless, that Engleson may have received the grievance and thus may have known of at least one of plaintiff's complaints does not establish Engleson's deliberate indifference. A high-level non-medical official generally is shielded from liability where an inmate is under the care of medical personnel. *See, e.g., Berry v. Peterman,* 604 F.3d 435, 440 (7th Cir. 2010) ("As a nonmedical administrator, [warden] was entitled to defer to the judgment of jail health professionals so long as he did not ignore [plaintiff]."); *Ortiz v. Bezy,* 281 F. App'x 594, 598 (7th Cir. 2008) ("[A] non-medical prison official is not deliberately indifferent for relying upon medical staff to make appropriate decisions regarding treatment."); *Johnson v. Snyder,* 444 F.3d 579, 586 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini,* 724 F.3d 965, 967 (7th Cir. 2013) (holding that warden was insulated from liability because he believed medical staff were addressing plaintiff's medical needs). "The Governor, and for that matter the Superintendent of Prisons and the Warden of each prison, is entitled to relegate to the prison's medical staff the provision of good medical care." *Burks*, 555 F.3d at 595.

Although, as explained above, this case reflects plaintiff's dissatisfaction with the effectiveness of his treatment in abating his GERD symptoms, the record reflects that he

received substantial treatment, which included numerous visits with different levels of medical personnel, a diagnostic ultrasound, laboratory work, anti-nausea medication, reflux medications, I.V. hydration, and special dietary permits.  The timing of the grievance mailed to Engleson is unknown, but plaintiff's receipt of this care for his GERD episodes was steady and continual throughout his incarceration at NRC.   Engleson, who is not a medical professional, was entitled to rely on the treatment recommendations and the urgency assigned to plaintiff's condition by the medical professionals treating him.  *See Zirko v. Ghosh*, 2015 WL 6447768, *16 (N.D. Ill Oct. 26, 2015).  Moreover, on the one occasion where plaintiff and Engleson interacted personally regarding his health, she directed his immediate entry to the healthcare unit.   Accordingly, even taking the evidence in a light most favorable to plaintiff, there is insufficient evidence for a jury to find that Engleson was aware of and deliberately indifferent to his GERD condition.  *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991) ("[O]nly the unnecessary *and wanton* infliction of pain implicates the Eighth Amendment.) (internal quotation marks and citation omitted); *Holmes v. Shah*, 748 F. App'x 72, 74 (7th Cir. 2019) (prison official who ignored plaintiff's letters was not liable because "each time [plaintiff] wrote [the official] a letter, he was (as we have explained) already receiving constitutionally adequate treatment").

### ii.    Officer Haire

Plaintiff testified that he does not recall any particular interaction with Officer Haire but that, if he is named as a defendant, it means he "ignored" plaintiff's request to go to the healthcare unit because of a GERD episode.  "A prison official must respond reasonably to a known risk of harm, but negligence or even gross negligence is not enough to show a constitutional violation."  *Giles v. Tobeck*, 895 F.3d 510, 513 (7th Cir. 2018) (citing *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)).  This standard is difficult to meet as it requires a

prisoner to show evidence suggesting "something approaching a total unconcern for the prisoner's welfare in the face of serious risks," *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006); *Smith v. Alvarez*, 898 F. Supp. 2d 1057, 1065 (N.D. Ill. 2012) (same), or "a conscious, culpable refusal to prevent harm." *Dunmore v. Fahim*, No. 11 CV 1000, 2012 WL 895431, at *4 (S.D. Ill. Mar. 15, 2012), *aff'd sub nom. Dunmore v. Godinez*, 551 F. App'x 273 (7th Cir. 2014) (citations omitted). Based on the scant evidence in the record regarding Officer Haire, no reasonable jury could find that this exacting standard has been demonstrated.

Plaintiff did not present evidence from which to infer that Officer Haire comprehended a need for immediate medical attention and consciously disregarded the risk to plaintiff without it. *See Farmer*, 511 U.S. at 837; *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc); *see Caffey v. Maue*, 679 Fed. Appx. 487, 490 (7th Cir. 2017) (holding that, where plaintiff had been struck on head and requested medical attention from guard but "did not tell [officer] about the nature or extent of his [] injury," which was "not visually apparent," ignoring his request for doctor did not constitute deliberate indifference"). Summary judgment is often referred to as "the 'put up or shut up' moment in litigation," where "the non-moving party is required to marshal and present the court with the evidence []he contends will prove her case." *Goodman v. Natl. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) (quoting *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 476 (7th Cir. 2010)). Moreover, the frequency of care reflected in plaintiff's medical records suggests that any delays that plaintiff encountered between the onset of symptoms and transport to the healthcare unit were not substantial but, rather, given the non-emergency nature of plaintiff's GERD flare-ups, consistent with the realities of scheduling medical appointments, both in the correctional context and for private citizens. *See Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016) (noting that "delays are common in the prison setting

with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment."). Officer Haire is entitled to summary judgment in his favor.

For all the above reasons, the Medical Defendants' and the IDOC Defendants' motions for summary judgment are granted.[2]

## IV. Conclusion

The Medical Defendants' and the IDOC Defendants' motions for summary judgment (dkts.143, 136) are granted. The Clerk is directed to enter final judgment in favor of all defendants.

Date: March 5, 2019

_____
U.S. District Judge Joan H. Lefkow

---

[2] If plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this court. *See* Fed. R. App. P. 24(a)(1).

Plaintiff need not bring a motion to reconsider the court's ruling to preserve his appellate rights. However, if plaintiff wishes the court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). A Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).